IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| STEVEN E. FEINLEIB, M.D. ) | |
| 22499 Calverton Road ) | |
| Shaker Heights, OH 44122 ) | Civil Action No.: |
| ) | |
|     individually and on behalf of a class ) | |
|     of persons similarly situated, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | |
|  -v- ) | CLASS ACTION COMPLAINT |
| ) | |
| ASSOCIATION OF AMERICAN MEDICAL ) | JURY TRIAL DEMANDED |
| COLLEGES ) | |
| 2450 N Street, NW ) | |
| Washington, DC 20037-1126 ) | CASE NUMBER 1:02CV01091 |
| ) | |
| NATIONAL RESIDENT MATCHING PROGRAM ) | JUDGE: Richard W. Roberts |
| 2450 N Street, NW ) | |
| Washington, DC 20037-1127 ) | DECK TYPE: Antitrust |
| ) | |
| AMERICAN MEDICAL ASSOCIATION ) | DATE STAMP: 06/05/2002 |
| 515 N. State Street ) | |
| Chicago, IL 60610 ) | |
| ) | |
| AMERICAN HOSPITAL ASSOCIATION ) | |
| One North Franklin ) | |
| Chicago, IL 60606-3421 ) | |
| ) | |
| AMERICAN BOARD OF MEDICAL SPECIALTIES ) | |
| 1007 Church Street, Suite 404 ) | |
| Evanston, IL 60201-5913 ) | |
| ) | |
| COUNCIL OF MEDICAL SPECIALTY SOCIETIES ) | |
| 51 Sherwood Terrace, Suite M ) | |
| Lake Bluff, IL 60201-5913, and ) | |
| ) | |

ACCREDITATION COUNCIL FOR GRADUATE          )
MEDICAL EDUCATION                           )
515 N. State Street, Suite 2000             )
Chicago, IL 60610-4322                      )
                                            )
    individually, and   )
                                            )
MEDSTAR-GEORGETOWN HOSPITAL                 )
MEDICAL CENTER, INC.                        )
3800 Reservoir Road NW                      )
Washington, DC 20007                        )
                                            )
GEORGE WASHINGTON UNIVERSITY                )
Office of General Counsel                   )
2100 Pennsylvania Ave., NW, Suite 525       )
Washington, DC 20052                        )
                                            )
MEDSTAR HEALTH, INC.                        )
5565 Sterrett Place, 5th Floor              )
Columbia, MD 21044                          )
                                            )
ADMINISTRATORS OF THE TULANE                )
EDUCATIONAL FUND                            )
1430 Tulane Avenue                          )
New Orleans, LA 70112                       )
                                            )
BARNES-JEWISH HOSPITAL                      )
One Barnes-Jewish Hospital Plaza            )
St. Louis, MO 63110                         )
                                            )
BAYLOR COLLEGE OF MEDICINE                  )
Office of General Counsel                   )
One Baylor Plaza                            )
Houston, TX 77030                           )
                                            )
BETH ISRAEL DEACONESS MEDICAL               )
CENTER, INC.                                )
330 Brookline Avenue                  )
Boston, MA 02105                            )
                                            )

2

BETH ISRAEL MEDICAL CENTER     )
10 Nathan D. Perlman Place       )
New York, NY 10003        )


BOSTON MEDICAL CENTER CORPORATION )
One Boston Medical Center Place     )
Boston, MA 02118        )
                )
CEDARS-SINAI MEDICAL CENTER   )
8700 Beverly Blvd., Suite 2112      )
Los Angeles, CA 90048       )
                )
THE CLEVELAND CLINIC FOUNDATION  )
9500 Euclid Avenue        )
Cleveland, OH 44195       )
                )
DUKE UNIVERSITY HEALTH SYSTEM, INC. )
DUMC Box 3701         )
Durham, NC 27710        )
                )
EMORY UNIVERSITY       )
1380 South Oxford Road, NE      )
Atlanta, GA 30322        )
                )
HENRY FORD HEALTH SYSTEM    )
One Ford Place          )
Detroit, MI 48202        )
                )
THE MASSACHUSETTS GENERAL HOSPITAL )
55 Fruit Street          )
Boston, MA 02114        )
                )
THE MCGAW MEDICAL CENTER OF   )
NORTHWESTERN UNIVERSITY    )
750 North Lake Shore Drive, Suite 601   )
Chicago, IL 60611-4403       )
                )
THE MOUNT SINAI SCHOOL OF MEDICINE )
OF THE CITY UNIVERSITY OF NEW YORK )
Attn: General Counsel        )

One Gustave L Levy Place                              )
New York, NY 10029                                   )
                                                     )
THE NEW YORK AND PRESBYTERIAN HOSPITAL               )
Presbyterian Hospital                                )
Office of Legal Affairs                         )
525 East 68th Street                                 )
New York, NY 10021                                   )
                                                     )
RHODE ISLAND HOSPITAL                                )
593 Eddy Street                                      )
Providence, RI 02903                                 )
                                                     )
RUSH-PRESBYTERIAN-ST. LUKE'S MEDICAL                 )
CENTER                                               )
1650 W. Harrison Street                              )
Chicago, IL 60612                                    )
                                                     )
ST. LOUIS UNIVERSITY                                 )
Office of the General Counsel                   )
DuBourg Hall 219                                     )
221 North Gand Blvd.                                 )
St. Louis, MO 63103                                  )
                                                     )
STANFORD HOSPITAL AND CLINICS                        )
Office of the General Counsel                   )
482 Galvez Mall                                      )
PO 20386                                             )
Stanford, CA 94305                                   )
                                                     )
STRONG MEMORIAL HOSPITAL OF THE                      )
UNIVERSITY OF ROCHESTER                              )
Office of the General Counsel                   )
601 Elmwood Avenue                                   )
Rochester, NY 14642                                  )
                                                     )
THOMAS JEFFERSON UNIVERSITY                          )
HOSPITAL, INC.                                       )
111 S. 11th Street                                   )
Philadelphia, PA 19107                               )
                                                     )

4

UNIVERSITY HOSPITALS OF CLEVELAND, INC.      )
10524 Euclid Avenue, Suite 1100      )
Cleveland, OH 44106      )
      )
WASHINGTON UNIVERSITY MEDICAL CENTER      )
660 South Euclid Avenue      )
St. Louis, MO 63108      )
      )
WILLIAM BEAUMONT HOSPITAL      )
16500 W. Twelve Mile Road      )
PO Box 5072      )
Southfield, MI 48086      )
      )
YALE-NEW HAVEN HOSPITAL, INC.      )
20 York Street      )
New Haven, CT 06504, and      )
      )
YESHIVA UNIVERSITY      )
Office of the General Counsel      )
Wilf Campus      )
500 West 185 Street      )
New York, NY 10033-3201      )
      )
     individually and on behalf of      )
     a class of entities similarly situated,      )
      )
     Defendants.      )

_____

     Plaintiff, Steven E. Feinleib, M.D., individually and on behalf of a class of persons similarly

situated, state against Defendants as follows:

## **OVERVIEW**

     1.  Plaintiff brings this action under the federal antitrust laws for: (a) money damages and other

appropriate relief to compensate resident physicians for the harm they suffered as a result of a longstanding,

nationwide contract, combination and conspiracy among Defendants and others to illegally restrain

competition in the market for resident physician services; and (b) injunctive relief to end the illegal restraints.

2.  Defendants and others have illegally contracted, combined and conspired among themselves to displace competition in the recruitment, hiring, employment and compensation of resident physicians, and to impose a scheme of restraints which have the purpose and effect of fixing, artificially depressing, standardizing and stabilizing resident physician compensations and other terms of employment.

3.  Defendants' illegal combination and conspiracy has restrained competition in the employment of resident physicians by: (a) stabilizing wages below competitive levels by exchanging competitively sensitive information regarding resident physician compensation and other terms of employment; (b) eliminating competition in the recruitment and employment of resident physicians by assigning prospective resident physician employees to positions through the National Resident Matching Program ("NRMP"); and (c) establishing and complying with anticompetitive accreditation standards and requirements through the Accreditation Council for Graduate Medical Education ("ACGME").

4.  The named Plaintiff and each member of the Plaintiff Class is currently or was recently employed as a resident physician, and has been injured by Defendants' illegal contract, combination and conspiracy.

5.  Each of the named Defendants and members of the Defendant Class directly participate in the illegal contract, combination and conspiracy alleged herein, and are either employers of resident physicians, entities related to and/or affiliated with such employers, or professional organizations through which the illegal restraints set forth in this Complaint are accomplished.

## JURISDICTION AND VENUE

6.  Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and

6

reasonable attorneys' fees, against the named Defendants and members of the Defendant Class for injuries sustained by the named Plaintiff and the Plaintiff Class as a result of violations of Section 1 of the Sherman Act, 15 U.S.C. §1, as alleged herein.

7.  Personal jurisdiction exists over all defendants pursuant to §12 of the Clayton Act, 15 U.S.C. §22, and the District of Columbia Long-Arm Statute, D.C. Code §13.423.

8.  Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. §22, and 28 U.S.C. §§1391(b) and (c).  Each of the named Defendants maintains offices, has representatives, may be found, and/or transacts business within this District within the meaning of Section 12 of the Clayton Act, 15 U.S.C. §22.

9.  Each of the named Defendants and members of the Defendant Class illegally contract, combine and conspire with persons and entities that have committed, and continue to commit, overt acts within the District of Columbia in furtherance of the contract, combination and conspiracy alleged in this Complaint.

**PLAINTIFFS**

10.  Plaintiff Steven E. Feinleib, M.D. is currently a general internist practicing in Willoughby, Ohio. In June 2000, Dr. Feinleib completed a three-year ACGME-accredited internal medicine residency program at University Hospitals of Cleveland in Cleveland, Ohio.  Dr. Feinleib obtained his residency position through the NRMP.

11.  As set forth below, the proposed Plaintiff Class (collectively "resident physicians") consists of all persons employed as resident physicians in ACGME-accredited residency programs (including programs combined of ACGME-accredited residency programs and subspecialty programs commonly referred to as fellowships) since June 5, 1998.

**DEFENDANTS**

12.  Each of the named Defendants and members of the Defendant Class is involved with the employment of resident physicians.  All have contracted, combined and conspired to restrain competition in the recruitment, hiring, employment and compensation of resident physicians, and to fix, depress, standardize and stabilize compensation for resident physicians and to impair other terms of their employment.

**ORGANIZATION DEFENDANTS**

13.  Defendant NRMP is an Illinois not-for-profit corporation maintaining its principal office in Washington, DC.  The NRMP is managed and operated by Defendant Association of American Medical Colleges ("AAMC") from AAMC's offices in Washington, DC using AAMC staff personnel.  The NRMP exists for the sole purpose of illegally restraining trade by eliminating competition in the recruitment and employment of resident physicians by assigning prospective resident physician employees to medical residency positions.

14.  Defendant ACGME is an Illinois not-for-profit corporation maintaining a field representative in Washington, DC.  The ACGME accredits institutions ("Sponsoring Institutions) operating medical residency programs in one or more specialties, as well as the individual residency programs ("Sponsored Programs") affiliated with those and other institutions including, among others, 11 institutions and more than 100 residency programs located in Washington, DC.

15.  Defendant AAMC is an Illinois not-for-profit corporation maintaining its principal office in Washington, DC.  AAMC membership includes all 125 accredited medical schools (including those medical schools named as Defendants in this Complaint) and approximately 375 major teaching hospitals

8

and health systems in the United States (including those hospitals and systems named as Defendants in this Complaint). These hospitals and health systems are Member Hospitals of AAMC's Council of Teaching Hospitals and Health Systems section ("COTH"). Certain COTH members are located in Washington, DC. The AAMC is one of five governing sponsors of both the NRMP and the ACGME.

16. Defendant American Medical Association ("AMA") is an Illinois not-for-profit corporation maintaining an office in Washington, DC. AMA membership consists of physicians and others in the health care field. Numerous AMA members practice in Washington, DC. The AMA is one of five governing sponsors of both the NRMP and the ACGME.

17. Defendant American Hospital Association ("AHA") is an Illinois not-for-profit corporation maintaining an office in Washington, DC. AHA membership includes approximately 5,000 hospitals, health systems, and other health care providers in the United States, including approximately 1,250 hospitals employing resident physicians. Certain AHA members are located in Washington, DC. The AHA is one of five governing sponsors of both the NRMP and the ACGME.

18. Defendant American Board of Medical Specialties ("ABMS") is an Illinois not-for-profit corporation whose membership consists of 24 recognized medical specialty certification boards in the United States. These medical specialty boards develop and apply professional and education standards for the evaluation and certification of physician specialists. The ABMS is one of five governing sponsors of both the NRMP and the ACGME.

19. Defendant Council of Medical Specialty Societies ("CMSS") is an Illinois not-for-profit corporation whose membership consists of 17 physician societies in specialties having a member board participating in ABMS. The CMSS is one of five governing sponsors of both the NRMP and the

9

ACGME.

## INSTITUTION DEFENDANTS

20.  Defendant Medstar-Georgetown Hospital Medical Center, Inc. ("Medstar-Georgetown") is a District of Columbia not-for-profit corporation with its principal place of business in Washington, DC. Medstar-Georgetown sponsors medical residency programs, employing members of the Plaintiff Class. Medstar-Georgetown has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.

21.  Defendant George Washington University, of which the George Washington University School of Medicine ("GWUSM") is a part, is a District of Columbia not-for-profit corporation with its principal place of business in Washington, DC.  George Washington University, through GWUSM, sponsors medical residency programs, employing members of the Plaintiff Class.  George Washington University has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.

22.  Defendant MedStar Health, Inc. ("MedStar Health") is a Maryland not-for-profit healthcare corporation registered in the District of Columbia as a foreign corporation and doing business in the District of Columbia as Washington Hospital Center.  MedStar Health sponsors medical residency programs, employing members of the Plaintiff Class.  It has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.

23.  Defendant Administrators of the Tulane Education Fund ("Tulane"), which operates the Tulane University School of Medicine, is a Louisiana not-for-profit corporation with its principal place of business

10

in New Orleans, Louisiana.  Tulane, through the Tulane University School of Medicine, sponsors medical

residency programs, employing members of the Plaintiff Class.  Tulane has contracted, combined and

conspired with the named Defendants and others to restrain competition as alleged in this Complaint.

Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

24.  Defendant Barnes-Jewish Hospital is a Missouri not-for-profit corporation with its principal

place of business in St. Louis, Missouri.  Barnes-Jewish Hospital sponsors medical residency programs,

employing members of the Plaintiff Class.  Barnes-Jewish Hospital has contracted, combined and conspired

with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain

conspiratorial acts in which this Defendant participated took place in Washington, DC.

25.  Defendant Baylor College of Medicine ("Baylor") is a Texas not-for-profit corporation with

its principal place of business in Houston, Texas.  Baylor, through its affiliated hospitals, sponsors medical

residency programs, employing members of the Plaintiff Class.  Baylor has contracted, combined and

conspired with the named Defendants and others to restrain competition as alleged in this Complaint.

Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

26.  Defendant Beth Israel Deaconess Medical Center, Inc. ("Beth Israel Deaconess") is a

Massachusetts not-for-profit corporation with its principal place of business in Boston, Massachusetts.

Beth Israel Deaconess sponsors medical residency programs, employing members of the Plaintiff Class.

Beth Israel Deaconess has contracted, combined and conspired with the named Defendants and others to

restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant

participated took place in Washington, DC.

27.  Defendant Beth Israel Medical Center ("Beth Israel") is a New York not-for-profit

11

corporation with its principal place of business in New York, New York. Beth Israel sponsors medical residency programs, employing members of the Plaintiff Class. Beth Israel has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which the Defendant participated took place in Washington, DC.

28.  Defendant Boston Medical Center Corporation ("Boston Medical") is a Massachusetts not-for-profit corporation with its principal place of business in Boston, Massachusetts. Boston Medical sponsors medical residency programs, employing members of the Plaintiff Class. Boston Medical has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

29.  Defendant Cedars-Sinai Medical Center ("Cedars-Sinai") is a California not-for-profit corporation with its principal place of business in Los Angeles, California. Cedars-Sinai sponsors medical residency programs, employing members of the Plaintiff Class. Cedars-Sinai has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

30.  Defendant The Cleveland Clinic Foundation ("The Cleveland Clinic") is an Ohio not-for-profit corporation with its principal place of business in Cleveland, Ohio. The Cleveland Clinic sponsors medical residency programs, employing members fo the Plaintiff Class. The Cleveland Clinic has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

31.  Defendant Duke University Health System, Inc. ("Duke") is a North Carolina not-for-profit

12

corporation with its principal place of business in Durham, North Carolina. Duke sponsors medical residency programs, employing members of the Plaintiff Class. Duke has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

32. Defendant Emory University ("Emory"), of which the Emory School of Medicine is a part, is a Georgia not-for-profit corporation with its principal place of business in Atlanta, Georgia. Emory, through the Emory School of Medicine, sponsors medical residency programs, employing members of the Plaintiff Class. Emory has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

33. Defendant Henry Ford Health Systems ("Henry Ford") is a Michigan not-for-profit corporation with its principal place of business in Detroit, Michigan. Henry Ford sponsors medical residency programs, employing members of the Plaintiff Class. Henry Ford has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

34. Defendant The Massachusetts General Hospital ("Massachusetts General") is a Massachusetts not-for-profit corporation with its principal place of business in Boston, Massachusetts. Massachusetts General sponsors medical residency programs, employing members of the Plaintiff Class. Massachusetts General has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

35.  Defendant The McGaw Medical Center of Northwestern University ("McGaw") is an Illinois not-for-profit corporation with its principal place of business in Chicago, Illinois.  McGaw consists of a consortium of hospitals and Northwestern University, which sponsors medical residency programs, employing members of the Plaintiff Class.  McGaw has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

36.  Defendant The Mount Sinai School of Medicine of the City University of New York ("Mount Sinai") is a New York not-for-profit corporation, with its principal place of business in New York, New York.  Mount Sinai sponsors medical residency programs, employing members of the Plaintiff Class.  Mount Sinai has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

37.  Defendant The New York and Presbyterian Hospital ("New York Presbyterian") is a New York not-for-profit corporation with its principal place of business in New York, New York.  New York Presbyterian sponsors medical residency programs, employing members of the Plaintiff Class.  New York Presbyterian has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

38.  Defendant Rhode Island Hospital is a Rhode Island not-for-profit corporation with its principal place of business in Providence, Rhode Island.  Rhode Island Hospital sponsors medical residency programs, employing members of the Plaintiff Class.  Rhode Island Hospital has contracted, combined and

14

conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

39. Defendant Rush-Presbyterian-St. Luke's Medial Center ("Rush-Presbyterian") is an Illinois not-for-profit corporation with its principal place of business in Chicago, Illinois. Rush-Presbyterian sponsors medical residency programs, employing members of the Plaintiff Class. Rush-Presbyterian has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

40. Defendant St. Louis University, of which the St. Louis University School of Medicine is a part, is a Missouri not-for-profit corporation with its principal place of business in St. Louis, Missouri. St. Louis University, through the St. Louis University School of Medicine, sponsors medical residency programs, employing members of the Plaintiff Class. St. Louis University has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

41. Defendant Stanford Hospital and Clinics ("Stanford") is a California not-for-profit corporation with its principal place of business in Stanford, California. Stanford sponsors medical residency programs, employing members of the Plaintiff Class. Stanford has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint. Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

42. Defendant Strong Memorial Hospital of the University of Rochester ("Strong Memorial") is a New York not-for-profit corporation with its principal place of business in Rochester, New York.

Strong Memorial sponsors residency programs, employing members of the Plaintiff Class.  Strong Memorial has contracted, combined and conspired with the named Defendants and with others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

43.  Defendant Thomas Jefferson University Hospital, Inc. ("Thomas Jefferson Hospital") is a Pennsylvania not-for-profit corporation with its principal place of business in Philadelphia, Pennsylvania. Thomas Jefferson Hospital sponsors medical residency programs, employing members of the Plaintiff Class. Thomas Jefferson Hospital has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

44.  Defendant University Hospitals of Cleveland, Inc. ("University Hospitals") is an Ohio not-for-profit corporation with its principal place of business in Cleveland, Ohio.  University Hospitals sponsors medical residency programs, employing members of the Plaintiff Class.  University Hospitals has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

45.  Defendant Washington University Medical Center is a Missouri not-for-profit corporation with its principal place of business in St. Louis, Missouri.  Washington University Medical Center sponsors medical residency programs, employing members of the Plaintiff Class.  Washington University Medical Center has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated

16

took place in Washington, DC.

46.  Defendant William Beaumont Hospital ("William Beaumont") is a Michigan not-for-profit corporation with its principal place of business in Royal Oak, Michigan.  William Beaumont sponsors medical residency programs, employing members of the Plaintiff Class.  William Beaumont has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

47.  Defendant Yale-New Haven Hospital, Inc. ("Yale-New Haven") is a Connecticut not-for-profit corporation with its principal place of business in New Haven, Connecticut.  Yale-New Haven sponsors medical residency programs, employing members of the Plaintiff Class.  Yale-New Haven has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

48.  Defendant Yeshiva University ("Yeshiva"), of which the Albert Einstein College of Medicine ("AEC") is a part, is a New York not-for-profit corporation with its principal place of business in the Bronx, New York.  Yeshiva, through AEC, sponsors medical residency programs, employing members of the Plaintiff Class.  Yeshiva has contracted, combined and conspired with the named Defendants and others to restrain competition as alleged in this Complaint.  Certain conspiratorial acts in which this Defendant participated took place in Washington, DC.

## PLAINTIFF CLASS ALLEGATIONS

49.  Plaintiff brings this suit on behalf of himself and as a class action pursuant to the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons employed

as resident physicians in ACGME-accredited residency programs (including programs combined of

ACGME-accredited programs) since June 5, 1998 ("Plaintiff Class").  ACGME-accredited residency

programs include subspecialty programs commonly referred to as fellowships.

50.  Plaintiff estimates the Plaintiff Class to number more than 200,000 persons geographically

dispersed throughout the United States, making joinder of all class members impracticable.

51.  Questions of law and fact common to members of the Plaintiff Class include:

a.  whether compensation for resident physicians and other terms of employment have been

fixed, depressed, standardized and/or stabilized at levels below those which would prevail in a competitive

market;

b.  whether Defendants and others have illegally allocated prospective residents to

residency positions, unlawfully exchanged competitively sensitive information, and/or established and agreed

to anticompetitive accreditation standards and requirements;

c.  whether Defendants and others have illegally contracted, combined and conspired to

restrain competition in the recruitment, hiring, employment and/or compensation of resident physicians;

d.  the amount of damages suffered by Plaintiff and members of the Plaintiff Class as a result

of Defendants' illegal restraints; and

e.  whether injunctive relief should issue to prohibit Defendants' illegal restraints.

52.  The individual Plaintiff's claims are typical of the claims of all members of the Plaintiff Class.

The interests of the individual Plaintiff are not antagonistic to the interests of other members of the Plaintiff

Class, and the individual Plaintiff will fairly and adequately protect the interests of members of the Plaintiff

Class.  Plaintiff is represented by counsel experienced in the prosecution of antitrust class actions.

18

53.  Defendants have acted, and refused to act, on grounds generally applicable to the Plaintiff Class, thereby making final injunctive relief appropriate as to the Plaintiff Class.

54.  The questions of law and fact common to the members of the Plaintiff Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

55.  A plaintiff class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Plaintiff Class is readily defined and prosecution of a plaintiff class action will eliminate the possibility of repetitious litigation, while also providing redress for claims which in some instances may be too small to warrant the expense of individual complex litigation.

## DEFENDANT CLASS ALLEGATIONS

56.  Plaintiff brings this suit against the named individual Defendants and as a class action pursuant to the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  The defendant class consists of: (a) all NRMP Institutional Participants as of the date of certification of the defendants class, and entities that were NRMP Institutional Participants at any time since June 5, 1998; (b) all AAMC/COTH Member Hospitals as of the date of certification of the Defendant Class, and entities that were AAMC/COTH Member Hospitals at any time since June 5, 1998; and ( c) all ACGME-accredited Sponsoring Institutions as of the date of certification of the Defendant Class, and entities that were ACGME-accredited Sponsoring Institutions at any time since June 5, 1998 ("Defendant Class").  The Defendant Class excludes all entities that are instrumentalities of federal, state or local government, including hospital districts and counties.

57.  Plaintiff estimates the Defendant Class to number more than 1,000 entities geographically

dispersed throughout the United States, making joinder of all class members impracticable.

58.  Questions of law and fact common to members of the Defendant Class include, as alleged in detail below:

a.  whether compensation for resident physicians and other terms of employment have been fixed, depressed, standardized and/or stabilized at levels below those which would prevail in a competitive market;

b.  whether Defendants and others have illegally allocated prospective residents to residency positions, unlawfully exchanged competitively sensitive information, and/or established and followed anticompetitive accreditation standards and requirements;

c.  whether Defendants and others have illegally contracted, combined and conspired to restrain competition in the recruitment, hiring, employment and/or compensation of resident physicians;

d.  the amount of damages suffered by Plaintiff and members of the Plaintiff Class as a result of Defendants' illegal restraints; and

e.  whether injunctive relief should issue to prohibit Defendants' illegal restraints.

59.  The individual Defendants' defenses are typical of the defenses of all members of the Defendant Class.  The interests of the individual Defendants are not antagonistic to the interests of other members of the Defendant Class, and the individual Defendants will fairly and adequately protect the interests of members of the Defendant Class.

60.  Defendants have acted, and refused to act, on grounds generally applicable to the Plaintiff Class, thereby making final injunctive relief appropriate against the Defendant Class.

61.  The questions of law and fact common to the members of the Defendant Class predominate

20

over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

62.  A defendant class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Defendant Class is readily defined and prosecution of a defendant class action will eliminate the possibility of repetitious litigation.

## INTERSTATE COMMERCE

63.  Defendants' activities, including activities related to their illegal contract, combination and conspiracy to restrain competition in the recruitment, hiring, employment and compensation of resident physicians, are in the flow of, and substantially affect, interstate commerce.

64.  Among other things, in connection with the NRMP matching program, the exchange of competitively sensitive compensation information, and ACGME accreditation, Defendants communicate with each other and/or their professional organizations and/or with prospective resident physician employees across state lines using interstate telecommunications networks, the internet, and the United States mail.  Defendants also induce prospective resident physicians to cross state lines to interview for and accept employment positions.  Defendants also obtain millions of dollars in payments and funding from out-of-state sources, purchase millions of dollars of goods and services from out-of-state sources, and provide millions of dollars in services to patients crossing state lines to receive such services.

## RELEVANT MARKET AND
## DEFENDANTS' MARKET POWER

65.  The relevant geographic market for purposes of Plaintiff's claim is the United States.

66.  The relevant product market for purposes of Plaintiff's claim consists of the market for services

21

of resident physicians in ACGME-accredited residency programs (including programs combined of ACGME-accredited programs and subspecialty programs commonly referred to as fellowships). Combined programs function as educational tracks within two or more ACGME-accredited programs and qualify the resident for certification by more than one ABMS-member board.

67. Specialty certification by one of the ABMS-member boards is essential to graduating medical school seniors and other eligible prospective residents. ABMS-member boards, with few exceptions, accept only ACGME-accredited residency employment in satisfaction of certification requirements.

68. Defendants' accreditation standards, matching program, and information exchange are each effectively coextensive with the defined market.

69. Defendants have and exercise market power within the relevant market. The NRMP is the primary route by which applicants to residency programs obtain positions in ACGME-accredited residency programs. In 2000, more than 80% of all first-year postgraduate residency positions were offered exclusively through the NRMP matching program. One hundred percent of residency positions in the relevant market are subject to the ACGME's accreditation standards.

70. The anticompetitive restraints imposed on the relevant market by Defendants depress resident physician compensation below levels that would prevail in a competitive market and artificially slow the rate of compensation increases that would occur in a competitive market. Depressed salaries and a slowed rate of increase are indicia of Defendants' market power.

## EXCHANGE OF RESIDENT
## COMPENSATION INFORMATION

71. Defendants contract, combine and conspire to restrain competition in the recruitment, hiring,

22

employment and compensation of resident physicians by regularly exchanging among themselves competitively sensitive information on resident compensation and other terms of employment. This unlawful information exchange has the purpose and effect of depressing, standardizing and stabilizing compensation and other terms of employment. Reporting compensation levels also serves to police standardization, and deter and reveal "cheating" by employers. The unlawful information exchange occurs through the AAMC and the AMA.

72. AAMC/COTH annually surveys members of the COTH Section. Historically, and continuing through at least 1998, the survey sought future pricing information; it was distributed each year in the spring requesting anticipated compensation levels for the upcoming employment year to begin July 1. Sometime between 1998 and 2001, AAMC/COTH started distributing the surveys in July seeking compensation levels for the employment year beginning the first of that month. Based on the survey responses, AAMC/COTH publishes an annual report entitled "Survey of Housestaff Stipends, Benefits and Funding," which includes: (a) national average salaries for years one through six of post-graduate years of employment, including changes in dollar amounts and percentages for each since the prior year; (b) national average salaries for first-year residents from 1968 through the present, including for each year the dollar amount, dollar amount adjusted for inflation, and change in dollars and percentages from the prior year; (c) changes, in dollar amounts and percentages, since the prior year in four regional average salaries for years one through six of post-graduate years of employment; (d) national and regional average salaries for years one through six of post-graduate years of employment, by ownership type (state, municipal, church, other not-for-profit, Veterans Affairs, and medical school); and (e) detailed benefits such as health insurance, vision benefits, and prescription drug benefits.

73.  Approximately 75% of all residents are employed by AAMC/COTH members surveyed in connection with the resident compensation information exchange, and the resulting report is available to all employers in the relevant market.  Moreover, as alleged more fully below, current employer-specific salary information is accessible through an electronic database to the Defendants and members of the Defendant Class.

74.  Information included in the survey reports is highly specific.  Once salary information is broken down into subsets based on year of employment, region, and ownership type, those subsets consist of as few as five employers.

75.  Survey reports also include budget information, including resident compensation as a percentage of total operating budget, ratio of resident benefits to salaries, and funding sources for resident salaries.

76.  Full survey reports are distributed in October or November, with a "preliminary report" containing only salary information issued sometime before that.

77.  The annual survey data provides employers with a baseline for determining resident physician compensation for the upcoming year.  The following year employers are provided with another survey report which establishes a new baseline.  In this way, employers avoid straying from standardized compensation levels.

78.  In addition to the AAMC/COTH survey reports, employers have access to resident physician compensation information through an electronic database known as the Fellowship and Residency Electronic Interactive Database ("FREIDA"), which is maintained by the AMA.  The information contained in FREIDA is not average or aggregated data.  It is detailed and employer-specific.

79.  The illegal purpose of the AAMC/COTH surveys and reports to depress, standardize and stabilize resident physician compensation is revealed by the following historical features:

a.  survey reports for several years included a "regression analysis worksheet" allowing employers to calculate the average salaries paid in their particular circumstances, arrived at by using the Northeast region average as a base and adding or subtracting specific dollar amounts for the particular region in which the recipient is located and its type of hospital ownership;

b.  survey reports have at times included statistics on "atypical" deviations from salary averages, a statistic having no apparent purpose or effect other than furthering standardization; and

c.  shortly after the survey was instituted, employers were asked whether they favored establishing a "uniform schedule" for resident salaries with adjustments for regional cost of living differences – a suggestion for unconcealed price-fixing.  It was endorsed by approximately 70% of the subsequent respondents.

80.  Residency positions within the relevant market are sufficiently comparable across employers to allow Defendants to use effectively the exchanged information as part of a conspiracy to restrain competition.

### THE NATIONAL RESIDENT
### MATCHING PROGRAM

81.  Defendants contract, combine and conspire to restrain competition in the recruitment, hiring, employment and compensation of resident physicians through the NRMP matching program, a mechanism that eliminates a free and competitive market and substitutes a centralized, anticompetitive allocation system assigning prospective resident physicians ("applicants") to a single, specific and mandatory residency

position.  Defendants collectively design and implement this scheme and collectively agree to and comply with its anticompetitive restrictions.  The NRMP matching program has the purpose and effect of depressing, standardizing and stabilizing compensation and other terms of employment.

82.  The anticompetitive purpose and effect of the matching program is revealed in its genesis.  In 1952, the hospitals and other entities employing resident physicians determined that the continuation of free competition in recruiting, hiring, employing and compensating resident physicians was undesirable because the number of available residency positions outpaced the number of available candidates.  Employers determined that continued free competition would "bid up" compensation and other terms of employment by which employers commonly compete to attract employees.  Creating the matching program enabled employers to obtain resident physicians without such a bidding war, thereby artificially fixing, depressing, standardizing and stabilizing compensation and other terms of employment below competitive levels.  These anticompetitive goals continue today, as the NRMP itself recently recognized in stating: "The sole purpose of the matching program is to allow both applicants and programs to make selection decisions on a uniform basis and without pressure."

83.  While the fundamental contract, combination and conspiracy to restrain competition hearkens back to the very inception of the NRMP, Defendants periodically refine the matching program to strengthen and expand its anticompetitive effect and to close avenues of circumvention.  For example, certain withdrawal deadlines, already very restrictive, were recently changed to more effectively prevent employers from entering into "side-deals" with applicants and then withdrawing corresponding positions from the matching program before they were filled.  Additionally, the NRMP is presently developing systems for reporting NRMP violations to the respective specialty certification board that will ultimately decide an

26

applicant's request for certification.  More immediately, a resident who declines a match and obtains alternative employment may be subject to dismissal if his or her employer learns of the "match violation."

84.  The NRMP matching program imposes anticompetitive restraints through several of its features, including:

a.  adopting policies forcing the vast majority of prospective resident physicians to use the matching program rather than attempting to find employment on their own, for example, prohibiting employers from hiring outside the matching program graduating seniors of United States medical schools accredited by the Liaison Committee on Medical Education, and severely restricting attempts by employers and applicants to withdraw from the matching program;

b.  adopting policies ensuring that the centralized and exclusive matching process is irrevocably substituted for all aspects of competitive, individual negotiations, for example prohibiting employment agreements between matching program participants outside the match, and forcing applicants to commit contractually to any assigned position as a condition of enrolling in the matching program; and

c.  adopting and implementing policing mechanisms to compel compliance with the foregoing restraints, for example, requiring matching program participants to immediately report suspected policy violations to the NRMP, and advising accreditation authorities of employer violations and certification authorities of resident physician violations.

## ACGME ACCREDITATION STANDARDS

85.  Defendants contract, combine and conspire to restrain competition in the recruitment, hiring, employment and compensation of resident physicians through their collective creation of ACGME accreditation standards and their collective voluntary agreement to, and compliance with, those standards.

27

ACGME accreditation standards have the purpose and effect of depressing, standardizing and stabilizing compensation and other terms of employment.  The ACGME has significant influence on employers since accreditation is, for all practical purposes, necessary to attract resident physician employees.  With few exceptions, only resident physicians who complete specified employment periods in ACGME-accredited institutions and programs or combined programs are eligible for ABMS-member board certification.

86.  The ACGME accreditation standards unreasonably restrain competition in the recruitment, hiring, employment and compensation of resident physicians and fix, depress, standardize and stabilize compensation and other terms of employment in several ways, including:

a.  the ACGME has authority to regulate the number of employment positions a particular program may offer, and exercises that authority;

b.  the ACGME imposes substantial obstacles to the ability of a resident physician to transfer employment from one employer to another during the period of residency, essentially making the NRMP assignment effective for the entire duration of residency;

c.  the ACGME encourages and/or requires participation in the NRMP as a condition of accreditation; and

d.  in reviewing compliance with accreditation standards, the ACGME directly reviews compensation and other terms of employment with the purpose and effect of fixing, depressing, standardizing and stabilizing such compensation and terms.

## PRIOR ANTICOMPETITIVE CONDUCT

87.  Physicians, hospitals, and their professional associations have a long history of operating markets in violation of the antitrust laws, including the market which is the subject of this Complaint.  In

28

1996, the Association of Family Practice Residency Directors entered into a consent order and final

judgment settling the United States Department of Justice's allegations that the Association had conspired

to restrain competition among family practice residency programs by promulgating guidelines which limited

recruitment practices and the payment of certain kinds of economic incentives to prospective residents –

claims very similar to plaintiff's claims here.  *See United States v. Association of Family Practice*

*Residency Directors,* 1996 WL 557841 (W.D. Mo., Aug. 15, 1996).

88.  Physicians, hospitals and their professional organizations have engaged in numerous other

anticompetitive and illegal activities, for example, explicit price-fixing.  *See, e.g., Arizona v. Maricopa*

*County Medical Society,* 457 U.S. 332 (1982) (fixing physicians' fees); *United States v. Utah Society*

*for Healthcare Human Resources Administration,* 1994 WL 729931 (D. Utah, Sept. 14, 1994) (fixing

nurses' salaries); and *In the Matter of Michigan State Medical Society,* 101 F.T.C. 191 ("Final Order,"

Feb. 17, 1983) (fixing physicians' fees).

89.  These entities have also been involved in boycotting members of competing professions.  *See,*

*e.g., Hahn v. Oregon Physicians' Services,* 868 F.2d 1022 (9th Cir. 1989) (podiatrists); *Blue Shield of*

*Virginia v. McCready,* 457 U.S. 465 (1982) (psychologists); *Wilk v. American Medical Ass'n,* 895

F.2d 352 (7th Cir. 1990) (chiropractors); *Weiss v. York Hospital*, 745 F.2d 786 (3d Cir. 1984)

(osteopathic physicians); *American Medical Ass'n v. Federal Trade Commission,* 638 F.2d 443 (2d

Cir. 1980) (affirming an FTC order and opinion prohibiting the AMA from restraining competition by

limiting physicians' ability to contract with non-physicians); *Virginia Academy of Clinical Psychologists*

*v. Blue Shield of Virginia,* 624 F.2d 476 (4th Cir. 1980) (psychologists); *American Medical Ass'n v.*

*United States,* 130 F.2d 233 (D.C. Cir. 1942) (group health association); and *Sweeney v. Athens*

*Regional Medical Center,* 709 F. Supp. 1563 (M.D. Ga. 1989) (nurse-midwives).

## EFFECTS OF DEFENDANTS' ANTICOMPETITIVE RESTRAINTS
## ON RESIDENT SALARIES AND WORKING CONDITIONS

90. Defendants' contract, combination and conspiracy has effectively eliminated competition for resident services among the Defendant employers and the Defendant Class members. Specifically, it has removed the ability of residents to achieve compensation for their services arrived at through competition by and between Defendant employers and the members of the Defendant Class and has instead illegally fixed and stabilized that compensation at artificially low rates.

91. Resident salaries are low, standardized, and stable. Despite their advanced education, long work hours, and valuable patient care services, first-year residents earned an average salary of about $35,700 during the 2000-2001 employment year, equating to about $10 per hour. Residents in their second and later years of employment were paid only slightly more, with lock-step increases based on the year of employment. Residents generally earn less, on both an annualized and hourly basis, than other hospital employees such as nurse practitioners and physician assistants. The hourly compensation paid resident physicians in their residency positions is substantially lower than what those same physicians can (and sometimes do) earn providing services to a hospital during off-duty hours ("moonlighting"), although many employer do not allow "moonlighting" by resident physicians.

92. Employers pay residents standardized salaries, regardless of such factors as program prestige, medical specialty, geographic location, resident merit and year of employment. With few exceptions, employers pay salaries very close to the national average and very close to each other. By contrast, post-residency physicians earn widely varying compensation based on these factors, especially geographic

30

location and medical specialty.

93.  Resident salaries have been very stable over a long period of time.  Adjusted for inflation, the average first-year resident salary has remained virtually unchanged for more than thirty years.  In total dollars, the average first-year resident salary has crept up marginally each year to keep pace with inflation, and little if any more.

94.  The resident physicians' relatively low hourly wage rate is exacerbated by the long working hours which are demanded of them.  Defendants' anticompetitive conduct also permits employers to exploit resident physicians by routinely requiring 60 to 100 hours of work per week, or more, often including 36-hour and 48-hour shifts.

**VIOLATION OF SECTION 1**
**OF THE SHERMAN ACT, 15 U.S.C. §1**

95.  Plaintiff realleges and incorporates by reference each and every allegation set forth above.

96.  Defendants and members of the Defendant Class have contracted, combined and conspired to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

97.  The contract, combination and conspiracy alleged herein consists of a continuing agreement, understanding, and concert of action among Defendants and members of the Defendant Class to restrain competition in the recruitment, hiring, employment and compensation of resident physicians.

98.  Defendants and members of the Defendant Class illegally restrain competition in a number of

31

related ways, including:

a.   exchanging competitively sensitive information regarding resident physician compensation and other terms of employment;

b.   assigning prospective resident physician employees to positions through the NRMP; and

c.   establishing and complying with restrictive accreditation standards and requirements through the ACGME.

99.   The illegal restraints alleged herein have the purpose and effect of artificially fixing, depressing, standardizing and stabilizing resident physician compensation and other terms of employment.

100.   Each Defendant and member of the Defendant Class has participated in one or more overt acts in furtherance of the contract, combination and conspiracy alleged herein and has participated in the conspiratorial activities described.

101.   During the Class Period, Plaintiff and the Plaintiff Class were injured by the illegal restraints alleged herein.   Among other things, Plaintiff and the Plaintiff Class were compensated substantially less for their services than they would have been in the absence of the illegal restraints.   Plaintiff and the Plaintiff Class have sustained substantial losses and damage to their business and property as a result of the illegal restraints.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Plaintiff Class pray for judgment against all Defendants and the Defendant Class, jointly and severally, as follows:

A.   certifying this action as a plaintiff class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the

Federal Rules of Civil Procedure, certifying Plaintiff as Class Representative and designating its counsel as Plaintiff Class Counsel;

      B.  certifying this action as a defendant class action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, certifying Institutional Defendants as Class Representatives and designating their counsel as Defendant Class Counsel;

      C.  pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, enjoining all aspects of Defendants' and the Defendant Class' continuing violation of Section 1 of the Sherman Act;

      D.  entering judgment against Defendants and the Defendant Class in favor of Plaintiff and the Plaintiff Class and awarding Plaintiff and the Plaintiff Class three times actual damages against Defendants and the Defendant Class, jointly and severally, for their violation of Section 1 of the Sherman Act set forth herein;

      E.  granting Plaintiff and the Plaintiff Class the costs of prosecuting this action, together with pre- and post-judgment interest and reasonable attorneys' fees and costs; and

      F.  granting such other relief as this Court may deem just and proper under the circumstances.

## **JURY DEMAND**

      Plaintiffs demand trial by jury on all issues so triable.

Dated: June 5, 2002                    Respectfully submitted,

                                        By: _____

Michael L. Goldberg (D.C. Bar No. 384176)
Daniel A. Ball (D.C. Bar No. 370474)
GOLDBERG BALL, P.C.
1320 Old Chain Bridge Road, Suite 360
McLean, Virginia  22101
Telephone:  703-506-0550
Facsimile:   703-506-6829

SCHIFFRIN & BARROWAY, L.L.P.
Krishna B. Narine, Esquire
Three Bala Plaza East
Suite 400
Bala Cynwyd, Pennsylvania 19004
Telephone:      610-667-7706
Facsimile:      610-667-7056

WOLF HALDENSTEIN ADLER FREEMAN
  & HERZ, L.L.P.
Mary Jane Edelstein Fait, Esquire
656 West Randolph Street
Suite 500 West
Chicago, Illinois 60661
Telephone:      312-466-9200
Fax:             312-466-9292